IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

TIMOTHY YOUNGBLOOD,

        Plaintiff,

v.

SHARON L. BURTCH,

        Defendant.

Case No. 20-cv-183-NJR

# MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

Plaintiff Timothy Youngblood, an inmate of the Illinois Department of Corrections ("IDOC") who is currently incarcerated at Lawrence Correctional Center, brings this action for deprivations of his constitutional rights pursuant to 42 U.S.C. § 1983. This matter is now before the Court on Defendant Sharon L. Burtch's motion for summary judgment (Doc. 76). Youngblood, now represented by counsel, filed a response in opposition (Doc. 78).

## BACKGROUND

On January 30, 2020, Youngblood filed his Complaint (Doc. 1). That Complaint was dismissed for violations of Federal Rule of Civil Procedure 8, and Youngblood was granted leave to amend his Complaint (Doc. 14). On May 26, 2020, Youngblood filed an Amended Complaint (Doc. 17). He was allowed to proceed on the following count:

> Count 2:   First Amendment retaliation claim against Sharon Burtch for removing Youngblood from the law library and denying him call passes in retaliation for filing grievances.

(Doc. 18, p. 2).

During the relevant time period, Youngblood was incarcerated at Lawrence Correctional Center. He had two federal lawsuits pending and had been assigned counsel for both cases (Doc. 76-1, pp. 13, 15, 27). On October 13, 2020, he filed an appeal *pro se* in one of those cases, *Youngblood v. IDOC, et al.*, Case No. 17-807 (*Id*. at p. 14); *See* Case No. 17-807 (Doc. 115).

In 2019, Burtch was assigned to the library as a Corrections Law Library assistant (Doc. 76-2, pp. 7, 9). Burtch was the only staff member assigned to the library; when she was not working, the library was not staffed (*Id*. at p. 10). Burtch transferred out of the library for a short time in 2019, from the end of October through December (*Id*. at pp. 10-11). Specifically, she was temporarily re-assigned from November 4, 2019, to December 11, 2019, and was on vacation from December 24-31, 2019 (Doc. 77-8, p. 4; 77-6, p. 4). During her temporary assignment, another staff member, Julie Lewis, was assigned to the library (Doc. 76-2, p. 40). Records indicate that Burtch was also on vacation August 16 and 20, September 27, and the week of October 28-November 1, 2019 (Doc. 77-8, p. 1-3).

As a library assistant, Burtch scheduled inmates for call passes to the law library (Doc. 76-2, p. 12). She also maintained legal boxes in the library and scheduled inmates to access their boxes (*Id*.). In order to visit the library, an inmate needed to put in a request slip for the library (*Id*. at p. 21). Those requests would be delivered to the library, and Burtch would go through the list (*Id*. at pp. 22-23). There was a set schedule as to when each cell house had access to the library (*Id*. at pp. 25-27). She then scheduled individuals

for library time depending on their cellhouse and the set schedule (*Id.* at p. 27). There were limited spots for each house based on the schedule and the amount of inmates that could be in the library at one time for security measures (*Id.* at p. 29). Only 20 to 27 inmates were allowed at a time in the library (*Id.* at p. 31). Once the library was full, Burtch could not let any additional inmates in from the scheduled house (*Id.* at p. 29). She also tried to schedule an additional day once a week for inmates with upcoming deadlines so that their deadlines could be met (*Id.* at pp. 29-30).

Burtch testified that she tried her best to make sure everyone had an opportunity at the library as much as they could. If an inmate had a pending deadline for a court filing, that inmate got priority (*Id.* at p. 30). If an inmate had been to the library the week before and did not have a deadline, then priority would go to another inmate who had not previously been able to access the library (*Id.*). Inmates who were *pro se* took precedence over those with an attorney (*Id.* at p. 118). If an inmate could not be scheduled for a call pass one week, she would keep that inmate's request slip on top of the remaining request slips for the next week (*Id.* at p. 32).

With the exception of inmates with pending deadlines, the inmate at the top of the list would be the first of the next group scheduled (*Id.*). Call lines could also be cancelled. For instance, the scheduled call line for January 18, 2019, was canceled due to a lockdown (Doc. 76-2, pp. 129-130; 76-3, p. 10). A number of library call passes were cancelled due to lockdowns (Doc. 76-3, pp. 14, 30, 50, 55; Doc. 76-4, pp. 1-2). Burtch testified that even if a cell house was currently on lockdown she would enter call passes for their normal library day in case there was any change in the status of the lockdown (Doc. 76-2, pp. 34-35).

Inmate passes also could be cancelled if they had a conflict with another call pass; for instance, a healthcare pass would override a library call pass (*Id*. at p. 51). She did not keep the request slip after the inmate was placed on the schedule (*Id*. at p. 44, 46).

Youngblood testified that he believed his cellhouse was scheduled once a week—on Thursdays—for the law library (Doc. 76-1, p. 30). He did not know of any factors considered in determining who went to the law library, other than those that put in requests (*Id*. at p. 35). In 2018 and 2019, Youngblood placed call passes to attend the library every week (*Id*. at pp. 56, 74). Although he did attend the law library on a number of occasions, he testified it was not every week like he wanted to attend. (*Id*. at p. 74). On two occasions, he did not receive a call pass but attended anyway to provide documents to be filed with the Court (*Id*. at pp. 33, 63-64). Burtch testified that she did not remember any specific times when Youngblood was skipped for a library call pass (Doc. 76-2, p. 52). She did recall that based on the number of call passes, her schedule for the law library was sometimes scheduled three weeks out (*Id*. at p. 53). An inmate could not just come over to the law library, he had to be approved (*Id*. at p. 67). There were times when Burtch might receive a call from a counselor or an officer asking that an individual be allowed to come over due to an urgent deadline (*Id*. at p. 66). The inmate's name could not have been on the original call pass summary list, but Burtch would make note of the attendance (*Id*. at pp. 66-67).

On August 22, 2019, Youngblood attended the law library (Doc. 76-2, p. 67). Youngblood testified that he attended the library to make legal copies. While there, he read a new policy regarding copying case law (Doc. 76-1, pp. 74-75). He wanted to make

copies of case law to send to his attorney in a pending case (*Id*. at pp. 75-77). Youngblood took issue with the new policy and told Burtch the policy was unconstitutional and that he was going to write a grievance about the policy (*Id*. at p. 77). Burtch acknowledged that the copy policy allows an inmate to make only one copy of a case; an inmate could not make multiple copies (Doc. 76-2, p. 80). Burtch told Youngblood that the policy was created by the warden (Doc. 76-1, p. 77). Youngblood testified when he said he was going to file a grievance, Burtch immediately got up, walked over to an officer, and directed the officer to escort Youngblood from the law library (*Id*. at pp. 82-83). He described Burtch's demeanor as "belligerent" based on body language and the look on her face (*Id*. at p. 84).

Demarcus Latin was also in the library at this time (Doc. 77-9, p. 13). He recalled Youngblood asking Burtch who wrote the copying policy, and she told him who created the policy (*Id*. at p. 15). Youngblood asked for a grievance form to write a grievance about the policy (*Id*.). Latin described Youngblood as calm; he did not yell or cuss (*Id*.). Latin testified that Burtch got upset about the request for a grievance, and she told him to get out of line and let the next person through (*Id*.). When Youngblood continued to ask for a grievance form, she asked the officer on duty to remove him from the library. Latin testified that Burtch told the officer Youngblood was aggressive and intimidating (*Id*. at p. 16). Latin stated Burtch developed an "attitude" after the request for a grievance, and her tone of voice was aggressive (*Id*. at pp. 18-19).

Burtch could not recall the exact details of her interactions with Youngblood on August 22, 2019 (Doc. 76-2, pp. 69, 83). She recalled that Youngblood was upset about copies and the posting about what items could be copied (*Id*. at p. 83). They talked about

the policy, Youngblood went and sat down, and then came back up to get copies (*Id.* at p. 84). When he returned for copies, Burtch asked to review his documents again, and Youngblood was upset that she asked to look at his documents twice (*Id.* at p. 86). She asked him to label his exhibits, and when he returned, Burtch wanted to review the documents again to ensure that he had complied with her request. According to Burtch, Youngblood was upset with her request to view the documents (*Id.* at pp. 86-87). She recalled him being loud and argumentative (*Id.* at p. 87). Youngblood refused to step aside so that she could help other inmates (*Id.* at pp. 89-90). When he refused to either step aside or receive his copies, she asked an officer to come in and address the situation (*Id.* at p. 90). Youngblood began debating the copying policy with the officer, and the officer told him that he needed to wait out in the hall (*Id.* at p. 98). Burtch informed the officer that she wanted to make sure Youngblood got his copies, and she did make the copies and gave them to him (*Id.*). The officer then had Youngblood wait in the hall while the line finished up (*Id.*). Burtch could not recall if he stated he was going to file a grievance (*Id.* at p. 83, 88).

After their interactions in the library, Youngblood wrote a grievance about the incident (Doc. 76-1, p. 90). For grievances written against Burtch, she would be contacted with questions or asked to give information for a response to the grievance (Doc. 76-2, pp. 15-16). Although contacted for information, she never saw the original grievance (*Id.* at p. 17).

Youngblood testified that after his interactions with Burtch in the library on August 22, 2019, he was excluded from the law library (Doc. 76-1, p. 91). He testified that

he believed that he came back the following week, but later clarified that he did not attend the law library until two weeks after the incident (*Id*. at pp. 91-92; Doc. 77-2, p. 9). But his trips were not as frequent as before; he believed it might have been every two weeks (Doc. 76-1, p. 92). He testified that if Burtch wanted to schedule him every week for the law library, she could have, but she did not after he wrote the grievance (*Id*. at p. 93). He believed that she excluded him and manipulated his call passes (*Id*. at p. 94). Youngblood acknowledged that when he was in the library, Burch assisted him with copies or notary requests (*Id*. at p. 98).

According to the call pass log, in 2019, Youngblood had passes for the law library on January 3, 10, and 17, February 1, 7, 19, and 28, March 8, 14, 21, and 22, April 4, 5, 11, and 25, May 2, 9, and 23, June 6, 13, and 27, July 18, August 2 and 22, September 5, October 11, and November 27.[1] In the beginning of 2020, he attended January 8, 15, 22, and 29 and February 5 (Doc. 76-5, p. 1).

## LEGAL STANDARDS

### A. Summary Judgment Standard

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *Archdiocese of Milwaukee v. Doe*, 743 F.3d 1101, 1105 (7th Cir. 2014), citing FED. R. CIV. P. 56(a). *Accord Anderson v. Donahoe*, 699 F.3d 989, 994 (7th Cir. 2012). A genuine issue of

---

[1] The call pass for November 27, 2019 was cancelled due to a lockdown (Doc. 77-3, p. 149).

material fact remains "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). *Accord Bunn v. Khoury Enter., Inc.*, 753 F.3d 676, 681-82 (7th Cir. 2014).

In assessing a summary judgment motion, a district court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party. *Anderson*, 699 F.3d at 994; *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011). As the Seventh Circuit has explained, as required by Rule 56(a), "we set forth the facts by examining the evidence in the light reasonably most favorable to the non-moving party, giving [him] the benefit of reasonable, favorable inferences and resolving conflicts in the evidence in [his] favor." *Spaine v. Community Contacts, Inc.*, 756 F.3d 542 (7th Cir. 2014).

### B. Retaliation

Prison officials may not retaliate against an inmate for exercising his First Amendment rights, even if their actions would not independently violate the constitution. *See Zimmerman v. Tribble*, 226 F.3d 568, 573 (7th Cir. 2000), *Bridges v. Gilbert*, 557 F.3d 541, 552 (7th Cir. 2009). In order to prevail on a claim of retaliation, a plaintiff must show that he "engaged in protected First Amendment activity, suffered a deprivation that would likely deter future First Amendment activity, and the First Amendment activity was a motivating factor in the defendant's decision to take the retaliatory action." *Jones v. Van Lanen*, 27 F.4th 1280, 1284 (7th Cir. 2022) (quoting *Walker v. Groot*, 867 F.3d 799, 803 (7th Cir. 2017)); *Winston v. Fuchs*, 837 F. App'x 402, 404 (7th Cir. 2022) (a plaintiff must show the defendant "was motivated to punish him with materially adverse action because he engaged in constitutionally protected activity."). Thus, a

plaintiff must set forth a chronology of events and show that his First Amendment activities were a motivating factor for an adverse action. *DeWalt v. Carter*, 224 F.3d 607, 618 (7th Cir. 2000). In this context, an adverse action is one that would chill or deter a person of ordinary firmness from exercising a First Amendment right. *Bart v. Telford,* 677 F.2d 622, 625 (7th Cir. 1982). Once the plaintiff meets his burden, the burden shifts to the defendant to show that in the absence of the protected conduct, the harm would have occurred anyway. *Greene v. Doruff,* 660 F.3d 975, 979 (7th Cir. 2011).[2]

## ANALYSIS

Youngblood argues that he was removed from the library on August 22, 2019, and denied substantial access to the law library in the months after the August 22 incident in retaliation for confronting Burtch and filing a grievance regarding the copying policy. The Court first notes that the simple removal from the law library on August 22 would not be sufficient to deter a person of ordinary firmness from continuing to engage in protected conduct. Youngblood points to Burtch's demeanor during their encounter; he and Latin both testified that Burtch was upset by Youngblood's questions regarding the

---

[2] Burtch argues that the Supreme Court recently determined that for First Amendment retaliation claims, a plaintiff must show "but for" causation. In *Nieves v. Bartlett*, 139 S.Ct. 1715 (2019), in determining whether probable cause for an arrest defeated a retaliatory arrest claim, the Supreme Court noted that "a plaintiff must establish a 'casual connection' between the defendant's 'retaliatory animus' and the plaintiff's 'subsequent injury.'" *Nieves*, 139 S.Ct. at 1722. The Supreme Court held that an official's retaliatory motive must cause the injury and it must be a "but-for" causation, "meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Id*. But the Seventh Circuit recently applied its standard of requiring a plaintiff to set forth a *prima facia* case of retaliation with burden shifting, even after *Nieves*. *Douglas v. Reeves*, 964 F.3d 643, 646 (7th Cir. 2020); *Manuel v. Nally*, 966 F.3d 678, 680 (7th Cir. 2020). Thus, for purposes of this motion, the Court will review the evidence in light of the Seventh Circuit's burden-shifting standard.

copying policy and his indication that he would file a grievance. They described her attitude as aggressive or belligerent, based on the way she walked and her "look." But Burtch testified that she provided Youngblood with the copies before he left, and Youngblood acknowledged that he was able to return to the law library two weeks later. He also waited in the hall and did not receive any discipline as a result of the incident (Docs. 76-1, p. 89, 91; 76-2, p. 98). Such a minimal asserted injury does not amount to a First Amendment violation. *See Douglas v. Reeves*, 964 F.3d 643, 647-48 (7th Cir. 2020) (Noting that a minimal injury without "some significant deterrent effect in the prison context" could resolve the issue at the summary judgment stage.). Further, there is no indication that Burtch made any statements or threats which would indicate a retaliatory motive. *Chatman v. Pierce*, 583 F. App'x 548, 549-50 (7th Cir. 2014) (suspicious timing supported by threats could infer a retaliatory motive).

Youngblood argues that, taken together, the initial removal and the limited access afterwards was both a sufficient deterrent and retaliatory. Burtch was not working in the law library from November 4, 2019, until December 11, 2019. During the months of November and part of December, she had no control over scheduling inmates for the law library. She was also on vacation from October 28-November 1, 2019, and December 24–31, 2019. Thus, during those times, the library was closed, and no inmates were allowed in the law library. Instead, Youngblood focuses on the nine weeks directly after the incident in the library and prior to Burtch being temporarily transferred, arguing he was only allowed to attend the library on two occasions. He was given a library pass on September 5, 2019, and October 11, 2019 (Doc. 77-11, p. 1). Youngblood argues that this

was substantially fewer times than he was scheduled in the previous nine weeks. From June 27 to August 22, he was scheduled four times for the library: June 27, July 18, August 2 and 22, 2019 (Doc. 76-5, p. 1). Youngblood makes much of this reduction in access to the library, arguing that the reduction from four to two scheduled visits directly after the August 22 incident and grievance creates at least a triable issue of fact as to whether the reduction was due to retaliation.

A plaintiff may certainly utilize circumstantial evidence to demonstrate retaliation. *See Kidwell v. Eisenhauer*, 679 F. 3d 957, 965-66 (7th Cir. 2012) (stating that a plaintiff may show retaliation by use of circumstantial evidence). Circumstantial evidence can "include suspicious timing, ambiguous statements, behavior, or comments." *Manuel v. Nally*, 966 F.3d 678, 680 (7th Cir. 2020) (quoting *Long v. Teachers' Ret. Sys. of Ill.*, 585 F.3d 344, 350 (7th Cir. 2009)). But suspicious timing alone does not evidence retaliation. *Manuel*, 966 F.3d at 681.

Although Youngblood argues that it was not only the timing but the degree to which his access was reduced—noting he had only two as opposed to four visits—the record reflects Youngblood experienced a similar schedule during the period that Burtch was not running the library. There are no allegations of retaliatory conduct during that period because Burtch was not in charge of the schedule. During the time period Burtch was out of the library, October 28 through December 10, Youngblood was only scheduled for the library on one occasion (Doc. 76-5, p. 1).³ Further, when Burtch returned from her

---

³ Burtch was on vacation the week of October 28, 2019, and started her temporary assignment on November 4, 2019. The assignment ended on December 10, 2019 (Doc. 77-8, p. 3; 77-6, pp. 3-4).

temporary assignment, she scheduled Youngblood for the law library on numerous occasions. The call logs indicate that Youngblood received library call passes for January 8, 15, 22, and 29 and for February 2, 2020 (Doc. 76-5, p. 1). The circumstantial evidence does not demonstrate a causal link between the limited library access and a retaliatory motive. *Manuel*, 966 F.3d at 681 (suspicious timing, without more, did not demonstrate that retaliation was at least a motivating factor).

Further, other non-retaliatory reasons for the limited schedule exist here. Burtch testified that she was limited in the number of inmates allowed into the law library at one time and that she tried to provide inmates with as much opportunity as possible to visit the library (Doc. 76-2, p. 30). Inmates with upcoming deadlines and those acting *pro se* were given priority. Youngblood acknowledged that he was represented in his two pending cases, and he fails to point to any pending deadlines during this time period (Doc. 76-1, pp. 64, 89). Further, Burtch testified that sometimes library access was scheduled for three weeks out due to the number of inmates wanting access to the law library (*Id.* at p. 53). Youngblood's library schedule reflects that there were only two weeks between the August 22 incident and his next library visit on September 5, 2019. There was a four-week gap until his next visit on October 11, 2019 (Doc. 76-5, p. 1). This schedule fits with Burtch's testimony regarding the scheduling of library time.

Even when viewing the facts in the light most favorable to Youngblood, there is simply nothing in the record from which a jury could find that Burtch's actions in scheduling Youngblood's library access was based on retaliation. Youngblood offers nothing more than his belief that Burtch was punishing Youngblood for questioning the

copying policy and writing a grievance. He offers only Burtch's awareness of the grievance and Youngblood's threat of filing a grievance as evidence of her retaliatory motive, which is not enough. *Jones*, 27 F.4th at 1284 (speculation of motive based on grievance filings not enough on its own to survive summary judgment). But there were clearly other reasons for why Youngblood's access might be limited at certain times as articulated by Burtch, and Youngblood fails to offer any evidence to suggest that the limitation on his library access was retaliatory.

## CONCLUSION

For the reasons stated above, Burtch's motion for summary judgment (Doc. 76) is **GRANTED**. The Clerk of Court is **DIRECTED** to enter judgment accordingly and close the case.

**IT IS SO ORDERED.**

DATED:   March 3, 2023

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**